US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

APR 1 8 2022

for the

Western District of Arkansas

JAMIE GIANI, Clerk

By

Deputy Clerk

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with Facebook account Lovely's Trendy Shop that is stored at premises controlled by Meta Platforms, Inc.

)
)
)
)
)
)

Case No.    5:22cm 00013

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 15 U.S.C. § 1125 | false designations of origin and false descriptions forbidden |
| 18 U.S.C. § 545 | smuggling goods into the United States |
| 18 U.S.C. § 2320(a) | trafficking in counterfeit goods or services |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Gerald Faulkner, Special Agent, HSI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 04/18/2022 _____

*Judge's signature*

City and state: Fayetteville, Arkansas

Hon. Christy D. Comstock, Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Gerald Faulkner, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.     I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), currently assigned to the Resident Agent in Charge Office in Fayetteville, Arkansas.  I have been so employed with HSI since April 2009.  As part of my duties as a HSI Special Agent, I investigate criminal violations related to the trafficking of counterfeit goods, the smuggling of illegal goods and currency in and out of the United States, money laundering, and other various federal law violations.  During my employment as a Special Agent, I have reviewed and participated in numerous investigations resulting in the arrests of individuals trafficking in counterfeit goods, the seizure of significant quantities of counterfeit merchandise, including but not limited to perfume, jewelry, handbags, sunglasses, and other items of commerce, and the seizure of illegal proceeds generated from that activity.  Many of the investigations that I have reviewed and participated in involved violations of federal statutes and

offenses that are within the jurisdiction of HSI, which is responsible for investigating violations related to international commerce and the illegal importation of stolen property, including "intellectual property" (patents, trademarks, copyright). This affidavit is being submitted based on information from my own investigative efforts as well as information obtained from others who have investigated this matter and/or have personal knowledge of the facts herein.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 15 U.S.C. § 1125 (false designations of origin and false descriptions forbidden), 18 U.S.C. § 545 (smuggling goods into the United States), and 18 U.S.C. § 2320(a) (trafficking in counterfeit goods or services) have been committed by Jennifer LEACH and LOVE'S TRENDY BOUTIQUE, LLC dba LOVELY'S TRENDY SHOP. There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

5.      On February 1, 2022, the FedEx Hub in Anchorage, Alaska, intercepted an inbound international package labeled "FASHION ACCESSORIES NECKLACE, RING, AND DRESSES FOR PERSONAL USE," which was selected for an intensive exam by CBP Officers.

6.      The express shipment was manifested with a declared total value of $85.00 USD.

7.      Upon physical examination by CBP Officers, the package contained designer name brand handbags, wallets, shirts and clutches.

8.      The following items were discovered by CBP Officers in the shipment; eleven (11) Gucci handbags, three (3) Dior handbags, seventeen (17) Goyard handbags, seven (7) Chanel handbags, nine (9) Yves Saint Laurent wallets, three (3) Dior shirts, and fourteen (14) Louis Vuitton clutch handbags.

9.      CBP Officers determined the items to be counterfeit due to the low invoice value, shipment originating outside normal supply chain for manufacturers, and poor-quality printing on retail packaging the shipment.

10.     CBP Officers confirmed all of the items to be counterfeit and infringe upon the registered and recorded trademark under Chanel TMK 06- 00705, Gucci TMK 89-00646, Louis Vuitton TMK 10-00855, Dior TMK 03-00709, TMK 01-00453, Goyard TMK 10-01137 and Yves Saint Laurent TMK 13-00193.

11.     CBP Officers seized the items pursuant to violations of Title 19, United States Code, Section 1526(e) - Intellectual Property Rights, Trademark/Trade Dress and Counterfeit Goods.

12.     The shipment routing details were recorded as having been sent from the Philippines to an address in the Western District of Arkansas, Fayetteville Division:

Sender:      ROCHELLE OCAMPO
             ANGELES STREET
             CALOOCAN CITY, PHILIPPINES

Recipient:   IRISH LOVE DECHAVEZ
             3003 COMMONS AVENUE
             SPRINGDALE, ARKANSAS

13.     On February 17, 2022, the FedEx Hub in Memphis, Tennessee, intercepted an inbound international package labeled "SOUVENIERS HANDBAGS10 SLEEPWEAR TER

Page **3** of **14**

NO5 SOUVENIERS," which was selected for an intensive exam by Customs and Border Protection (CBP) Officers.

14.     When the shipment arrived in the CBP exam area, it was examined and found to contain twenty-seven (27) Louis Vuitton Wallets, eight (8) Louis Vuitton Handbags, nine (9) Burberry Wallets, six (6) Gucci Wallets, two (2) Fendi Handbags, and three (3) Christian Dior Handbags.

15.     CBP Officers determined the wallets and handbags to be counterfeit based on the shipment's origin of country, low value, incorrect appearance, low quality, incorrect manifestation, and concealment method consistent with previous counterfeit concealment seizures.

16.     On February 25, 2022, CBP Officers detained the inbound shipment.

17.     On March 9, 2022, CBP Officers seized the shipment pursuant to violations of Title 19, United States Code, Section 1526(e) – Intellectual Property Rights, Trademark/Trade Dress and Counterfeit Goods.

18.     The shipment routing details were recorded as having been sent from the United Arab Emirates to a recipient in the Western District of Arkansas:

Sender:     DAN ROBERT DE VEGA
            PLOT NO. R364 OFFICE NO.507 KARAM
            DUBAI CITY, AE
            UNITED ARAB EMIRATES

Recipient:  JENEFER LEACH
            3003 COMMONS AVE SPRINGDALE
            SPRINGDALE, AR 72764
            UNITED STATES OF AMERICA

19.     Based on the above information, your Affiant conducted Department of Homeland Security (DHS) and open-source database queries to further identify the consignee of the contraband along with any associated businesses.

20.     The queries revealed Jenefer LEACH is believed to be Jenefer Monserate DeChavez-LEACH with a date of birth in 1983. LEACH is a native of the Philippines and is currently the spouse of a United States Citizen (Gregory LEACH) under Alien Registration Number ending in 2004. She is assigned the Social Security Administration number ending in 1161, and has an Arkansas driver's license bearing the number ending in 0533. The address associated to the driver's license is listed as being 3003 Commons Avenue in Springdale, Arkansas, which is in the Western District of Arkansas, Fayetteville Division. LEACH has also been recorded as utilizing the aliases of Irish Love Dechavez and Jenefer Casela.

21.     Additional record checks revealed LEACH is currently the owner and operator of LOVELY'S TRENDY SHOP, also known as LOVE'S TRENDY BOUTIQUE, LLC. The business appears to be home-based and was incorporated in Arkansas on August 18, 2021, with an active status and principal address of 3003 Commons Avenue in Springdale, Arkansas, which is in the Western District of Arkansas, Fayetteville Division.

22.     Publicly accessible social media database queries show LEACH created the Facebook business profile LOVELY'S TRENDY SHOP on or about August 20, 2020, and listed the page as a Products and Services platform. The associated contact number for the business and social media page is 479-419-0316. The business is described as selling luxury bags, wallets, shoes, clothes, and accessories. The email address linked to the profile account is jenefer_dechavez@yahoo.com. As of the date of this affidavit, the Facebook page currently has

approximately 3.7 thousand people or user profiles tagged or following LEACH's account. The modes of payment listed for the business are:

Cash App: $JeneferLeach;

Venmo: @lovely_leach;

PayPal: @jeneferleach1; and

Zelle: Jenefer Leach (479)419-0316.

23.     The Facebook page appears to have multiple previously recorded live feeds where LEACH is selling what is believed to be counterfeit merchandise similar to that which was seized by CBP online to her followers. Four of the recorded live sales were reviewed in their entirety and between October 1, 2021, and March 10, 2022, during which LEACH and another unknown female associate sold approximately 554 items to online viewers totaling approximately $19,715 dollars in sales. All the sales appear to have been paid to LEACH through the above-referenced online payment applications. The Facebook business page revealed LEACH is believed to have begun conducting online live sales in approximately August 2020.

24.     The following manufactures are a few of the knock-off or counterfeit products recorded as having been sold by LEACH via the online live sales: Gucci, Fendi, Marc Jacobs, Dior, Hermes, Louis Vuitton, David Yurman, Chanel, Bulgari, Van Cleef & Arpels, Tiffany, Versace, Tory Burch, Valentino Garavani, and Prada.

25.     Investigative efforts have shown the believed counterfeit designer goods LEACH is currently selling on her Facebook live feeds through LOVELY'S TRENDY SHOP are the same type of counterfeit products that CBP in Alaska and Tennessee seized in March 2022

Page **6** of **14**

destined to her home in Springdale, Arkansas, which is in the Western District of Arkansas, Fayetteville Division.

26.    In March 2022, your Affiant received lead information from the HSI National Intellectual Property Rights Center (IRPC) as well as from HSI Intel Research Specialists (IRS) in reference to LEACH and LOVELY'S TRENDY SHOP.

27.    A review of the documents revealed that from approximately July 2021 to March 2022, CBP has seized over 200 believed counterfeit handbags, wallets, hats, and fashion accessories bearing trademarks of Chanel, Dior, Prada, Gucci, Hermes, MCM, Versace, Fendi, Burberry, Yves St. Laurent, Balenciaga, and Louis Vuitton, that were shipped from the United Arab Emirates and Philippines, with a combined MSRP value of $500,000. All of the intercepted shipments were destined to LEACH in Springdale, Arkansas, which is in the Western District of Arkansas, Fayetteville Division.

28.    The following seizures with corresponding MSRPs were recorded by CBP as being associated to LEACH:

| DATE | REF# | ITEMS SEIZED | MSRP |
|------|------|--------------|------|
| 7/26/2021 | 2021sz0124144 | 22 counterfeit designer handbags | $64,710 |
| 8/18/2021 | 2021sz0134832 | 24 counterfeit designer handbags | $145,645 |
| 12/16/2021 | 2022sz0026293 | 24 counterfeit designer handbags | $71,010 |
| 12/30/2021 | 2022sz0029434 | 20 counterfeit designer handbags | $29,315 |
| 3/9/2022 | 2022sz0053946 | 55 counterfeit designer handbags and wallets | $67,650 |
| 3/17/2022 | 2022sz0056978 | 47 counterfeit designer handbags | $68,755 |
| 3/21/2022 | 2022sz0058100 | 25 counterfeit designer handbags and hats | $52,220 |

29.    Additional review of the intelligence reports showed from November 2019 to March 2022, LEACH has had approximately 487 shipments of handbags, wallets, and fashion accessories from various individuals in the Philippines and United Arab Emirates shipped to her

residential address at 3003 Commons Avenue or 1813 B West Huntsville Avenue, both located in Springdale, Arkansas, which is in the Western District of Arkansas, Fayetteville Division.

30.     Between approximately August 2020 and April 2022, LEACH has utilized her Facebook business profile page of LOVELY'S TRENDY SHOP to conduct approximately fifty-six (56) online live feeds where she has advertised and sold believed counterfeit high-end merchandise. Most live feeds involve LEACH showcasing and describing believed counterfeit items and then announcing a sale price to the thousands of followers on her Facebook business profile page watching the streaming video. Followers to the live feed are then instructed by LEACH to put the words "mine" along with the abbreviated description of the product being offered in the comments section of the live feed to secure the item for purchase. Followers are also instructed, upon completed online payments, to send LEACH, through the LOVELY'S TRENDY SHOP Facebook account, a private message with their personal shipping information for product delivery.

31.     In April 2022, your Affiant identified a particular purse LEACH was advertising for sale through a previously recorded Facebook live feed on the LOVELY'S TRENDY SHOP account. LEACH described the purse using the believed words, "Alma", "Damier" and "BB" and advertised the item's sale for $90. Your Affiant then located what appears to be the authentic version of the same purse on the Louis Vuitton website. The authentic version of the purse is better described as being an Alma Handbag Damier BB with an actual MSRP ranging from $1,750 to $2,150.

## INFORMATION REGARDING FACEBOOK

32.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share

communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

33. Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

34. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

35. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

36.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

37.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

38.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

39.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

40. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

41. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

42. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

43. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

44. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

45. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

46.    Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

47.    Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

48.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as

Page **12** of **14**

described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

49.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

50.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

51. Based on the foregoing, I request that the Court issue the proposed search warrant.

52. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

53. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

Respectfully submitted,

Gerald Faulkner
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on _____, 2022.

HON. CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE